## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| VINH DU, derivatively on behalf of ENTEROMEDICS, INC. and individually and on behalf of himself and all other similarly situated stockholders of ENTEROMEDICS, INC. | ) ) ) ) ) C.A. No. _____ ) |
| Plaintiff, | ) **JURY TRIAL DEMANDED** ) |
| v. | ) **CLASS ACTION** ) |
| GARY BLACKFORD, DAN W. GLADNEY, CARL GOLDFISCHER, BOBBY I. GRIFFIN, LORI C. MCDOUGAL, NICHOLAS L. TETI JR., JON T. TREMMEL, NAGEEB A. ANSARI, PETER M. DELANGE, PAUL F. HICKEY, SCOTT YOUNGSTROM, and ENTEROMEDICS, INC. | ) ) ) ) ) ) ) ) |
| Defendants. | ) ) |
| and | ) ) |
| ENTEROMEDICS, INC., | ) ) |
| Nominal Defendant. | ) ) |

### VERIFIED STOCKHOLDER DERIVATIVE AND CLASS ACTION COMPLAINT

Plaintiff Vinh Du ("Plaintiff") asserts on behalf of himself and other similarly situated stockholders of Defendant EnteroMedics, Inc. ("EnteroMedics" or the "Company") a claim for breach of fiduciary duty, and derivatively on behalf of EnteroMedics, claims for breach of

fiduciary duty and unjust enrichment, against current members of EnteroMedics's Board of Directors (the "Board") and various executive officers.[1]

## NATURE AND SUMMARY OF THE ACTION

1.       Plaintiff brings this action to address fiduciary misconduct in connection with a stockholder vote and a stock plan purportedly approved as a result of that vote. In order to entice stockholders to approve the stock plan, the Board misled them, making material representations and commitments, which the Board later dishonored. As a result, the Company's public stockholders have suffered a massive dilution of their interest in EnteroMedics – a consequence the Board assured them would not occur.

2.       In November 2016, EnteroMedics filed a proxy statement in connection with a special meeting of stockholders, at which the Board asked stockholders to, among other things, (a) provide the Board with authority to implement a reverse stock split at any ratio between 1-for-20 and 1-for-70, and (b) approve an amended stock plan that reserved 40,000,000 shares of common stock for equity awards to the Company's executive officers, non-employee directors, and other insiders.

3.       At the time the proxy was filed, EnteroMedics had approximately 139,870,467 outstanding shares of common stock.  The 40,000,000 shares reserved under the amended stock plan represented approximately 28.6% of the Company's outstanding shares. As these shares are issued to insiders, the Company's public stockholders will be diluted.

4.       In the proxy, the Board promised that stockholders would suffer no additional dilution from the amended stock plan as a result of the reverse stock split because the Board

---

[1] Plaintiff's allegations are made upon personal knowledge as to himself and his own acts, upon information and belief as to other matters, and are based upon the investigation conducted by and through his attorneys, which included, *inter alia*, a review of media reports and documents EnteroMedics filed with the U.S. Securities and Exchange Commission (the "SEC").

would reduce that plan's share reserve by the same ratio the Board eventually chose to effect the reverse stock split. Specifically, the Board told stockholders on two occasions that the 40,000,000 shares reserved under the amended stock plan would be reduced "by the Reverse Stock Split ratio selected by the Board." For example, if the Board selected a 1-for-70 reverse stock split ratio, thus reducing the number of outstanding shares to 1,998,150, the amended plan's 40,000,000 shares would likewise be reduced by a factor of 70 – to 571,429 shares – ensuring that the dilution rate caused by the issuance of shares under the amended plan would not be increased as a result of the reverse stock split.

5.      Immediately following the special meeting, the Board implemented a reverse stock split at a 1-for-70 ratio. However, contrary to the promise it made to stockholders to secure their consent, the Board did not make a proportional adjustment to the 40,000,000 shares reserved under the amended stock plan. Instead, the Board reduced the reserve to *3 million shares* – more than five times the size of what the reserve would have been – 571,429 – if the Board kept its promise. The Board then immediately tapped into these unauthorized excess shares and granted over one million stock options to themselves and other insiders.

## JURISDICTION AND VENUE

6.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a). Plaintiff and Defendants are citizens of different states and the matter in controversy exceeds $75,000, exclusive of interest and costs. Plaintiff is a citizen of the State of Washington and no defendant is a citizen of the State of Washington. This Court also has supplemental jurisdiction over the class claims herein pursuant to 28 U.S.C. § 1367(a).

7.      This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have. Venue is proper in this district because Defendant

EnteroMedics is incorporated in this District and because a substantial portion of the wrongs complained of herein occurred in this District.

## PARTIES

8.     Plaintiff purchased EnteroMedics common stock in 2014. Plaintiff is, and has been at all relevant times, the owner of EnteroMedics stock. Plaintiff resides in the State of Washington.

9.     EnteroMedics is a Delaware corporation which maintains its principal offices in St. Paul, Minnesota. It is a medical device company focused on the development and commercialization of neuroscience-based technology to treat obesity, metabolic diseases, and gastrointestinal disorders.

10.     Defendant Gary Blackford ("Blackford) has been an EnteroMedics director since August 2016. On information and belief, Blackford is a citizen of Minnesota.

11.     Defendant Dan W. Gladney ("Gladney") has been the Company's President, Chief Executive Officer, and a director since November 2015, and he has been Chairman of the Board since October 2016. On information and belief, Gladney is a citizen of Minnesota.

12.     Defendant Carl Goldfischer ("Goldfischer") has been an EnteroMedics director since 2004. On information and belief, Goldfischer is a citizen of California.

13.     Defendant Bobby I. Griffin ("Griffin") has been an EnteroMedics director since 2006. On information and belief, Griffin is a citizen of Minnesota.

14.     Defendant Lori C. McDougal ("McDougal") has been an EnteroMedics director since July 2015. On information and belief, McDougal is a citizen of Minnesota.

15.     Defendant Nicholas L. Teti, Jr. ("Teti") has been an EnteroMedics director since 2007. On information and belief, Teti is a citizen of California.

16.    Defendant Jon T. Tremmel ("Tremmel") has served as an EnteroMedics director since 2009. On information and belief, Tremmel is a citizen of Minnesota.

17.    Defendant Nageeb A. Ansari ("Ansari") has been the Company's Senior Vice President of Sales since January 2016. On information and belief, Ansari is a citizen of Florida.

18.    Defendant Peter M. DeLange ("DeLange") has been the Company's Senior Vice President of Operations and Business Development since January 2016. On information and belief, DeLange is a citizen of Minnesota

19.    Defendant Paul F. Hickey ("Hickey) has served as the Company's Senior Vice President of Marketing and Reimbursement since January 2016. On information and belief, Hickey is a citizen of Minnesota.

20.    Defendant Scott Youngstrom ("Youngstrom") has been the Company's Chief Financial Officer and Chief Compliance Officer since October 2016. On information and belief, Youngstrom is a citizen of Minnesota.

21.    Defendants Blackford, Gladney, Goldfischer, Griffin, McDougal, Teti, and Tremmel are collectively referred to herein as the "Board Defendants."  Defendants Ansari, DeLange, Hickey, and Youngstrom are collectively referred to herein as the "Officer Defendants."

## DUTIES OF THE BOARD DEFENDANTS

22.    As directors of a Delaware corporation, the Board Defendants owe the Company and its stockholders the fiduciary duties of good faith, loyalty, due care, and candor, and are required to manage the Company in a fair, just, honest, and equitable manner.

23.     Among other things, the Board Defendants must make full, fair, and truthful disclosures to EnteroMedics's stockholders, including when seeking stockholder approval for Board actions or proposals.

24.     Because of their positions with the Company, the Board Defendants were able to and did in fact exercise control over the wrongful acts complained of herein.

## FURTHER SUBSTANTIVE ALLEGATIONS

### A.  EnteroMedics's Nasdaq non-compliance and 2016 Special Meeting

25.     EnteroMedics's common stock trades on The Nasdaq Capital Market (the "Nasdaq") under the symbol "ETRM." The Nasdaq Marketplace Rules contain various continued listing criteria that companies must satisfy in order to remain listed on the exchange.  In May 2016, Nasdaq notified EnteroMedics that the Company was not in compliance with two Nasdaq listing requirements: (i) that the Company have a minimum of $2.5 million stockholders' equity (the "Stockholders' Equity Requirement"); and (ii) that the trading price of the Company's common stock have a minimum bid price of $1.00 per share (the "Minimum Bid Rule"). As of April 29, 2016, the Company had 9,254,451 outstanding shares of common stock. In May 2016, the average daily closing price of the Company's common stock was $0.69 per share. In addition to informing the Company of these violations, Nasdaq provided EnteroMedics with 180 days to regain compliance with these two requirements.

26.     In November 2016, Nasdaq notified EnteroMedics that the Company had not regained compliance with the Stockholders' Equity Requirement or the Minimum Bid Rule within the required period, and consequently, Nasdaq intended to delist EnteroMedics common stock from the exchange. The Company appealed the determination to a Listing Qualifications Panel and Nasdaq suspended its delisting determination pending a ruling on the appeal.

27.     In the interim, the Company submitted to Nasdaq a plan to regain compliance with the Stockholders' Equity Requirement and the Minimum Bid Rule.  To gain compliance with the Stockholders' Equity Requirement, the Company planned (a) to enter into agreements with the holders of the Company's 7.0% senior amortizing convertible notes (the "Notes") in order to facilitate the conversion of the Notes into equity; and (b) to conduct a public offering of equity.  To gain compliance with the Minimum Bid Rule, the Company planned to effectuate a reverse stock split at a ratio necessary to ensure that the per share trading price of the Company's common stock increased above the minimum bid price of $1.00 per share.

28.     On November 17, 2016, EnteroMedics filed with the SEC a Schedule 14A Definitive Proxy Statement (the "Proxy") in connection with a special meeting of stockholders scheduled for December 12, 2016 (the "Special Meeting").

29.     In Proxy Proposal No. 1, the Board sought stockholder approval of an amendment to the Company's Certificate of Incorporation (the "Certificate of Incorporation") to increase the number of authorized shares of common stock by 150 million, doubling the Company's authorized capital stock from 150 million shares to 300 million shares (the "Authorized Share Increase").

30.     As stated in the Proxy, the Authorized Share Increase was necessary in order to effectuate the conversion of the Notes into equity and thus help the Company regain compliance with the Stockholders' Equity Requirement. The Proxy disclosed that the Company had entered into an amendment to the purchase agreement with the Noteholders "to facilitate conversions and allow [the Company] to incentivize further conversions of the outstanding Notes into equity." As further stated in the Proxy, through September 30, 2016, $12.6 million of the Notes' principal amount was converted by the holders into approximately 67.3 million shares of EnteroMedics's

common stock. As of November 11, 2016, an additional $3.2 million of the Notes' principal had been converted by the holders into 39.7 million shares of the Company's common stock, and $2.6 million of principal remained outstanding on the Notes. Accordingly, "[b]ased on the price of [EnteroMedics] common stock on November 11, 2016 of $0.06, [the Company] would need to reserve an additional 15.1 million shares to convert the Notes at that price."

31.     The Proxy also indicated that the Authorized Share Increase was "necessary" to allow the Company to conduct a public offering of equity for the purpose of regaining compliance with the Stockholders' Equity Requirement. As stated in the Proxy, "pursuant to the plan [the Company] submitted to Nasdaq to regain compliance with the Stockholders' Equity Requirement, [the Company] anticipate[s] conducting a public offering of equity for the purpose of increasing [the Company's] stockholders' equity capital and regaining compliance with the Stockholders' Equity Requirement."

32.     In the Proxy, the Board recommended a "vote 'for' the Authorized Share Increase."

33.     In Proxy Proposal No. 2, the Board sought stockholder approval of an amendment to EnteroMedics's Certificate of Incorporation to effect a reverse stock split of the Company's issued and outstanding shares of common stock (the "Reverse Stock Split").

34.     As stated in the Proxy, if stockholders approved Proposal No. 2, the "Board would have the authority, but not the obligation, in its sole discretion and without further action on the part of the Company's stockholders, to implement a Reverse Stock Split at a ratio between 1-for-20 and 1-for-70." Upon implementation of the Reverse Stock Split, and depending on the ratio selected by the Board, each 20 to 70 shares of the Company's outstanding common stock

would be combined into one new share of common stock (with any fractional shares that would otherwise be issuable as a result of the split being rounded up to the nearest whole share).

35.     According to the Proxy, the Board "believe[s] that the only credible plan to regain compliance with the Minimum Bid Rule is to implement a reverse stock split to increase the per share trading price of [the Company's] common stock above Nasdaq's minimum bid price requirement of $1.00 per share[.]" As the Proxy further stated, the "Board believes that a Reverse Stock Split at a ratio of between 1-for-20 and 1-for-70, inclusive, as currently proposed, will be effective to increase the per share trading price of [the Company's] common stock above the minimum bid price of $1.00 per share required by Nasdaq[.]"

36.     As of November 12, 2016, EnteroMedics had 139,870,467 outstanding shares of common stock, which traded at $0.06 per share. Thus, if the Board selected a 1-for-70 ratio for the reserve stock split, the 139,870,467 shares of outstanding common stock would be combined into approximately 1,998,150 shares. At the same time, because a company's intrinsic value does not change as a result of a reverse stock split, the price per share of EnteroMedics' common stock would be expected to increase correspondingly by a factor of seventy.

37.     In the Proxy, the Board advised stockholders that, if Proposal No. 2 was approved, the directors "intend to implement the Reverse Stock Split promptly."

38.     In the Proxy, the Board recommended a "vote 'for' approval of the Reverse Stock Split."

39.     In Proxy Proposal No. 3, the Board sought stockholder approval of the Company's Second Amended and Restated 2003 Stock Incentive Plan (the "Amended Plan") to

amend and restate the Company's current Amended & Restated 2003 Stock Incentive Plan (the "Existing Plan").[2]

40.     The Existing Plan reserved a total of 1,320,000 shares of common stock for stock-based awards to insiders (the "Plan Capacity"). As of October 31, 2016, there were only 797,080 shares available under the Existing Plan.

41.     The Company's officers, employees, non-employee directors, consultants, and independent contractors were eligible to receive awards under the Existing Plan. As of October 31, 2016, approximately 33 employees and officers, ten consultants and independent contractors, and seven non-employee directors were eligible to participate in the Existing Plan.

42.     In propounding the Amended Plan, the Board sought to increase the Plan Capacity by 38,680,000 shares – from 1,320,000 shares to 40,000,000 shares. As stated in Proxy Proposal No. 3:

> Our Board has approved, subject to stockholder approval, the [Amended Plan]….
> If approved by our stockholders, the amendments included in the [Amended Plan] would:
>
> - increase the number of shares authorized for issuance under the Incentive Plan by 38,680,000 shares, from 1,320,000 shares to 40,000,000 shares[.]

43.     Approval of the Amended Plan was not necessary for the Company to regain compliance with either the Stockholders' Equity Requirement or the Minimum Bid Rule and was not part of the Board's plan for regaining compliance. Rather, the Amended Plan was proposed as a separate item and it was intended to serve as a compensation vehicle for the Company's

---

[2] The Board previously sought, but failed, to obtain stockholder approval of the Authorized Share Increase, the Reverse Stock Split, and the Amended Plan. Specifically, on September 19, 2016, the Company filed a Schedule 14A Definitive Proxy Statement with the SEC pursuant to which the Board sought stockholder approval of these three proposals at a special meeting scheduled for October 19, 2016.  However, on October 19, 2016, the Company announced that it was cancelling the special meeting "due to a lack of a sufficient number of votes in favor of" the Authorized Share Increase and the Reverse Stock Split.

officers, non-employee directors, and other employees. As stated in the Proxy, the Existing Plan "is the only stockholder approved plan pursuant to which [the Company] can grant stock options and other forms of stock-based compensation, and the limited number of shares remaining available under the [Existing] Plan restricts the Board's ability to make stock-based awards." Accordingly, the "Board and management believe" that approval of the increase in the reserved shares from 1,320,000 to 40,000,000 would be beneficial because stock-based awards are "instrumental in attracting, motivating and retaining talented employees, management personnel and non-employee directors." As the Proxy further stated: "The availability of stock-based compensation not only increases employees' focus on the creation of stockholder value, but also enhances employee retention and generally provides increased motivation for our employees to contribute to [the Company's] future success."

44.     The 40,000,000 shares the Board reserved under the Amended Plan, subject to stockholder approval, represented 28.6% of the Company's 139,870,467 outstanding shares on November 12, 2016.

45.     The Amended Plan encountered staunch resistance from proxy advisors, companies that advise stockholders on how to vote their shares. On October 7, 2016, Glass, Lewis & Co., LLC ("Glass Lewis"), a leading provider of proxy research and advice to institutional investors, issued a report in connection with EnteroMedics's Special Meeting (the "Glass Lewis Report"), which recommended a vote "against" the Amended Plan on the grounds that, among other things, it was "[e]xcessively dilutive." Specifically, the Glass Lewis Report stated that, "if this proposal is approved it will authorize shares for issuance that, when issued, would dilute current shareholders by [] over 25%[,] *an unacceptable level of potential dilution (and cost) to the Company and its shareholders*." (emphasis added). Glass Lewis added: "[We]

believe that shareholders deserve an opportunity to voice their opinion on equity compensation plans every three to four years; given the number of shares requested under this plan, it seems highly unlikely that the Company will meet this standard unless it is granting awards at an unreasonable pace."  In sum, Glass Lewis concluded that it did "not believe the Company has designed an incentive plan that adequately protects shareholder interests going forward."

46.     On November 24, 2016, Institutional Shareholder Service, Inc. ("ISS"), another leading provider of proxy research and advice to institutional investors, issued a report in connection with EnteroMedics's Special Meeting (the "ISS Report"), in which ISS evaluated, among other things, the "cost" of the Amended Plan.

47.     ISS measures the cost of an equity plan using a measure called Shareholder Value Transfer (or "SVT"), which assesses the magnitude of shareholders' equity transferred from a company to corporate insiders under an equity compensation plan. SVT is expressed as both a dollar amount and as a percentage of market value. ISS calculates an SVT benchmark for each company, which is based on its market capitalization, industry, and relevant performance metrics relative to peers. ISS considers an equity plan's SVT to be reasonable if it falls below the company-specific benchmark.

48.     As described in the ISS Report, the SVT benchmark for EnteroMedics was 12.94% and the Amended Plan's SVT was 34.44%. Based on a maximum score of 45, the Amended Plan scored a *negative 20.7*.

49.     Moreover, ISS also criticized the "liberal" change in control provision, which authorized the Board to accelerate the vesting of any awards granted under the Amended Plan upon a majority of the Board's determination "in [its] sole and absolute discretion" that there "has been a change in control."

50.     Specifically, the Amended Plan authorizes the Board "to provide in any award agreement . . . that the restrictions on the award may lapse, mature or the award may become exercisable on an accelerated basis upon a change in control of EnteroMedics," including if and when "a majority of the continuing directors determine, in their sole and absolute discretion, that there has been a change in control."

51.     As ISS noted, this definition would allow the Board to "accelerate the vesting of awards without the actual occurrence of a [change in control]."

52.     Accordingly, in light of its "excessive" estimated cost and its over-broad change in control provision as it relates to the accelerated vesting of awards, ISS recommended that shareholders vote "against" approval of the Amended Plan.

53.     While the extent of dilution represented by the Plan Capacity was a serious concern by itself, those concerns became even more acute in light of the anticipated Reverse Stock Split and the Amended Plan's "adjustment" provision. That provision is Section 4(c) of the Amended Plan, which provides:

> (c) Adjustments. **In the event that the Committee shall determine that any** dividend or other distribution (whether in the form of cash, Shares, other securities or other property), recapitalization, stock split, **reverse stock split**, reorganization, merger, consolidation, split-up, spin-off, combination, repurchase or exchange of Shares or other securities of the Company, issuance of warrants or other rights to purchase Shares or other securities of the Company or other similar corporate transaction or event **affects the Shares such that an adjustment is necessary in** order to prevent dilution or enlargement of the benefits or potential benefits intended to be made available under the Plan, **then the Committee shall, *in such manner as it may deem equitable*, adjust any or all of** (i) **the number** and type **of Shares** (or other securities or other property) that thereafter may be made the subject of Awards, (ii) the number and type of Shares (or other securities or other property) subject to outstanding Awards and (iii) the purchase or exercise price with respect to any Award; provided, however, that the number of Shares covered by any Award or to which such Award relates shall always be a whole number.

54.     As this language indicates, the Amended Plan itself does not require the Board to reduce the Plan Capacity proportionally in connection with a reduction in the Company's outstanding shares as a result of a reverse stock split. Instead, according to the Amended Plan, the Board could adjust the Plan Capacity in any "manner as it may deem equitable," including not at all. Such discretion could lead to drastic consequences for the Company's public stockholders.

55.     As of November 12, 2016, just prior to the filing of the Proxy, the Company had 139,870,467 outstanding shares. Because the Board intended to implement the Reverse Stock Split "promptly" upon its approval, stockholders understood that these 139,870,467 outstanding shares would soon be reduced to anywhere between 1,998,150 shares (using a 1-for-70 ratio) and approximately 6,993,523 shares (using a 1-for-20 ratio).

56.     The magnitude of the dilution that would be caused by the Amended Plan was thus entirely dependent on whether, and to what extent, the Board adjusted the Plan Capacity following the Reverse Stock Split.

57.     For example, if the Board effected a reverse stock split at a 1-for-70 ratio, reducing the Company's outstanding shares to approximately 1,998,150 shares, the Board could choose to adjust the Plan Capacity by the same 1-for-70 ratio as the stock split, which would reduce the Plan Capacity to 571,429 shares, equating to approximately 28.6% of the Company's then-outstanding shares. At the other extreme, the Board could choose not to adjust the Plan Capacity at all, maintaining the Amended Plan's reserve at 40,000,000 shares. In that scenario, the 40,000,000 shares would equate to a staggering 2,002% of the Company's outstanding shares

following the split. The issuance of those 40,000,000 shares would transfer to insiders control of 95% of the Company and effectively dilute public stockholders out of existence.[3]

58.     Therefore, given that a reverse stock split was imminent, the extent to which the Board intended to adjust the Plan Capacity in response to the split was highly material to stockholders in deciding whether to approve the Reverse Stock Split on the one hand, and the Amended Plan on the other.  If the Proxy was silent about the adjustments the Board would make, stockholders may have been unwilling to entrust the Board with the unlimited discretion provided in Section 4.3(c) to adjust or not adjust the Plan Capacity and may have voted against the Amended Plan as a result. Similarly, had the Proxy informed stockholders that, following a 1-for-70 reverse stock split, the Plan Capacity would be adjusted to 20,000,000, or 5,000,000, or even 1,000,000, stockholders may have likewise voted against the Amended Plan, given the amount of dilution those shares would represent when considering that the Company's then outstanding shares were being reduced to less than 2,000,000 shares.

59.     In order to minimize concerns about massive dilution, in the Proxy the Board unequivocally represented that, notwithstanding Section 4.3(c) of the Amended Plan, upon implementation of the Reverse Stock Split, the Board would make a proportional adjustment to the Plan Capacity "by the Reverse Stock Split ratio selected by the Board."

60.     Specifically, in urging stockholders to approve the Amended Plan, the Board stated:

> The [Current] Plan currently authorizes an aggregate of 1,320,000 shares of [the Company's] common stock for issuance under all stock-based awards. If the [Amended] Plan is approved by our stockholders, the maximum number of shares authorized for issuance under the Incentive Plan will be increased by

---

[3] If the Board chose to reduce the Plan Capacity by a lesser ratio, the Plan Capacity would be adjusted to somewhere between 571,429 and 40,000,000 shares, and the Company's stockholders would correspondingly suffer varying levels of dilution as those shares are issued.

38,680,000 shares to 40,000,000 shares . . . . Additionally, **the adoption of the [Amended] Plan would occur prior to the implementation of the Reverse Stock Split, and consequently, the number of shares of [the Company's] common stock authorized for issuance under all stock based awards granted pursuant to the Second A&R Incentive Plan *will be* adjusted by the Reverse Stock Split ratio selected by the Board**.  (emphasis added).

61.     The same assurance appears in Proxy Proposal No. 2, where the Board sought stockholder approval of the Reverse Stock Split. As stated in Proposal No. 2: "Additionally, if the [Amended Plan] is approved, [the Company] will have an additional 40,000,000 shares of [] common stock authorized for issuance under all stock based awards granted pursuant to the [Amended] Plan at the time of the Reverse Stock Split *that will also be adjusted by the Reverse Stock Split ratio selected by the Board.*" (emphasis added).

62.     Thus, according to the Proxy, if the Board selected, for example, a 1-for-70 ratio for the Reverse Stock Split, the Board would likewise reduce the Plan Capacity in the Amended Plan by 70-fold, *i.e.*, from 40,000,000 shares to 571,429 shares.

63.     As a result of the representations, the Company's stockholders were told precisely how many shares would be reserved under Amended Plan after the Reverse Stock Split and the magnitude of dilution they would face from the issuance of those shares.

64.     In the Proxy, the Board recommended a "vote 'for' approval of the Amended Plan."

65.     In a conference call with investors on November 30, 2016, Defendant Gladney further urged stockholders to vote in favor of the Amended Plan and other proposals, stating "[t]he passing of this shareholder vote is vital to our continued success. . . . [W]e need our

shareholders to vote yes on all four proposals. Failure to do so could have a very negative impact on our future operations."[4]

66.     On the basis of the various representations described above, EnteroMedics's stockholders approved the Authorized Share Increase, the Reverse Stock Split, and the Amended Plan at the Special Meeting on December 12, 2016.

**B. The Board breaks its promise and does not adjust the Plan Capacity proportionately to account for the Reverse Stock Split**

67.     Soon after the Special Meeting, on December 23, 2016, the Board authorized the implementation of the Reverse Stock Split at a 1-for-70 ratio.

68.     However, in direct contravention of the representations made just days earlier, the Board did not adjust the Plan Capacity proportionately to 571,429 shares. Rather, the Board adjusted the Plan Capacity to ***3 million shares*** – more than five times what the Plan Capacity would and should have been based on the proportional adjustment the Board promised it would make when it asked stockholders to approve the Amended Plan. The Board then immediately tapped into these unauthorized excess shares and granted over one million stock options under the Amended Plan to themselves and other insiders. This grant alone exceeded – by over a half million shares – the total amount of shares that would have been available if the Board made a proportional adjustment.

69.     As of December 16, 2016, the Company had 167,241,668 outstanding shares, an increase of approximately 27 million shares from November 2016 as a result of further conversions of the Notes into equity. On December 27, 2016, EnteroMedics implemented the

---

[4] The fourth proposal in the Proxy was the "[a]pproval of one or more adjournments to the Special Meeting, if necessary or appropriate, to establish a quorum or to permit further solicitation of proxies if there are not sufficient votes at the time of the Special Meeting cast in favor of Proposal 1, Proposal 2 or Proposal 3[.]"

Reverse Stock Split at a 1-for-70 ratio, at which point every 70 shares of the Company's then outstanding common stock were combined and reclassified into a single share of common stock. Accordingly, upon implementation of the Reverse Stock Split, EnteroMedics's 167,241,668 outstanding shares were reduced and combined into a total of approximately 2,389,166 outstanding shares.

70.     According to what the Board told stockholders it would do, the 40,000,000 shares reserved under the Amended Plan should have likewise been reduced by a factor of 70 – to 571,429 shares. This adjustment would have reserved approximately 24% of the Company's 2,389,166 outstanding shares.

71.     However, as stockholders soon discovered, the Board did ***not*** in fact proportionately adjust the Plan Capacity to properly account for the Reverse Stock Split.

72.     On January 18, 2017, EnteroMedics filed with the SEC a Form 424b4 Prospectus (the "Prospectus"), which disclosed that the Company was conducting a public offering of 751,412 shares of its common stock, 12,531 shares of preferred stock convertible into 2,359,887 shares of common stock, and warrants to purchase 3,111,299 shares of common stock (the "Offering"). As described above, the Offering was anticipated in order to help bring the Company into compliance with the Stockholders' Equity Requirement.

73.     As disclosed in the Prospectus, on December 16, 2016, just four days after stockholders approved the Amended Plan, the Board determined that it "intends to grant stock options to the Company's management team and board of directors under the [Amended] Plan exercisable, in the aggregate, for up to a number of shares of common stock equal to 20% of the Company's fully diluted shares of common stock outstanding after the [O]ffering."

74.     As further stated in the Prospectus, in connection with these awards, the Board "intends to, pursuant to the terms of the [Amended] Plan, adjust the number of shares available for awards under the [Amended] Plan **not** in direct proportion with the Reverse Stock Split in order to ensure the Company has an adequate number of shares available under the [Amended] Plan to attract, motivate, incentivize and retain employees, management personnel and non-employee directors going forward." (emphasis added).

75.     As later disclosed in a Form 8-K filed with the SEC on February 14, 2017, the Board only reduced the Plan Capacity by a factor of 13.33 (as opposed to a factor of 70) – from 40,000,000 to 3,000,000 shares. The 3,000,000 shares is 5.25 times more shares than what the Board led stockholders to believe the Plan Capacity would be in this scenario – 571,429 shares.

76.     As stated in the 8-K:

On February 8, 2017, the Board of Directors (the "Board") of EnteroMedics Inc. (the "Company") confirmed that, pursuant to the terms of the Second Amended and Restated 2003 Stock Incentive Plan (the "Plan"), the number of shares of common stock authorized under the Plan had been reduced from 40,000,000 shares to 3,000,000 shares as a result of the recent recapitalization of the Company consisting of the reverse stock split of the Company's common stock effected on December 27, 2016, and the public offering of the Company's stock which closed on January 23, 2017. Pursuant to the terms of the Plan, the Board is required to adjust the number of shares authorized under the Plan as it determines necessary after a recapitalization or other similar corporate transaction to prevent dilution or enlargement of the benefits or potential benefits intended to be made available under the Plan.

77.     The 3,000,000 shares represented 126% of the Company's approximately 2,389,166 outstanding shares following completion of the Reverse Stock Split. As a result of the Board's bait-and-switch tactics, the Board is claiming authority to use the Amended Plan's "adjustment" provision to issue more stock to insiders than the amount held by all of EnteroMedics's paid-in stockholders immediately following the Reverse Stock Split.

78.     Indeed, despite the Board's choice of the largest possible stock split (of 1 to 70) authorized by stockholders, the 13.33 adjustment is less than the proportional adjustment that would have been necessary based on the *smallest* possible reverse stock split authorized by stockholders (1 to 20), which would have resulted in a Plan Capacity of 2,000,000 shares.

79.     On January 23, 2017, EnteroMedics announced that the Offering closed and the Company had raised gross proceeds of $19 million.

80.     On February 8, 2017, under the Amended Plan, the Board granted 1,093,450 stock options to themselves and various executive officers (the "February 2017 Stock Options") as follows:

| Name | Position | Options |
|------|----------|---------|
| Gladney | President and CEO | 466,500 |
| Youngstrom | CFO and CCO | 142,200 |
| DeLange | Senior Vice President | 93,250 |
| Ansari | Senior Vice President | 93,250 |
| Hickey | Senior Vice President | 93,250 |
| Teti | Non-Employee Director | 40,000 |
| Goldfischer | Non-Employee Director | 35,000 |
| Tremmel | Non-Employee Director | 35,000 |
| Griffin | Non-Employee Director | 35,000 |
| McDougal | Non-Employee Director | 30,000 |
| Blackford | Non-Employee Director | 30,000 |
| **Total** | | **1,093,450** |

81.     Thus, with the February 17, 2016 Stock Options, the Board has already diluted the Company's stockholders by 522,021 more shares than would have been available if the Board followed through on its commitment to make a proportional adjustment.

**C.  The Amended Plan was not validly approved and the February 2017 Stock Options must be rescinded**

20

82.     In issuing a proxy solicitation, directors of Delaware corporations are required to provide stockholders with complete and truthful disclosure of all material facts in order to enable stockholders to cast a fully informed vote on the corporate business at hand.

83.     As described above, the amount of shares that would be reserved under the Amended Plan following the Reverse Stock Split was a material fact for a reasonable EnteroMedics stockholder in considering whether to approve the Amended Plan.

84.     In the Proxy the Board assured stockholders that, if they approved the Amended Plan, they would suffer no additional dilution as a result of the upcoming Reverse Stock Split because the Plan Capacity would be "adjusted by the Reverse Stock Split ratio selected by the Board" along with the total amount of EnteroMedics's outstanding shares.

85.     These representations and assurances were false. Following implementation of the Reverse Stock Split, the Board did not reduce the Plan Capacity by 70-fold, *i.e.*, by "the Reverse Stock Split ratio selected by the Board." The Board instead reduced the Plan Capacity to 3 million shares – more than five-times the 571,429 shares that would have been available if the Board followed through on its promise to make a proportional adjustment.

86.     Accordingly, the Company's stockholders voted to approve the Amended Plan based on materially false and misleading disclosures by the Board.

87.     The vote to approve the Amended Plan should therefore be deemed ineffective and the Amended Plan should be rescinded. Moreover, because all awards issued under the Amended Plan, including the February 2017 Stock Options, were not properly authorized by stockholders pursuant to valid votes, the grants are invalid and must be surrendered.

## DEMAND FUTILITY ALLEGATIONS

88.     Plaintiff brings this action derivatively on behalf of EnteroMedics to redress present and future injuries suffered by the Company as a direct and proximate result of Defendants' misconduct. Plaintiff is a stockholder of EnteroMedics and will adequately represent the interests of the Company in this litigation.

89.     At the time of this filing, the Board comprises seven members – Blackford, Gladney, Goldfischer, Griffin, McDougal, Teti, and Tremmel – each of whom has been named as a Defendant in this action.

90.     Plaintiff did not make a demand on the Board prior to instituting this action. A pre-suit demand upon the Board is a useless and futile action, and therefore excused.

91.     Each Board member was responsible for adopting the Amended Plan, making the false and misleading representations in the Proxy, and then immediately administering, or permitting the Amended Plan to be administered, in a manner that contradicts what stockholders were led to believe. These actions are not and could not have been a good faith exercise of business judgment, and accordingly, demand is excused.

92.     Additionally, each Board member received stock awards under the Amended Plan following its purported approval. To the extent the Amended Plan is rescinded, each of those awards will be null and void. Each Board member thus has a strong financial incentive to maintain the status quo by not authorizing any corrective action that would force them to disgorge their awards. Accordingly, each Board member is interested in this litigation, and would not be able to impartially consider a demand.  As such, demand is excused.

## CLASS ACTION ALLEGATIONS

93.     Pursuant to Federal Rule of Procedure 23, Plaintiff brings this action on his own behalf and as a class action on behalf of those who held EnteroMedics stock as of the close of business on November 3, 2016, which was the record date for stockholders entitled to vote at the Special Meeting, and who continue to hold shares through the present (the "Class"). Defendants are excluded from the Class, as are Defendants' affiliates, immediate families, legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

94.     This action is properly maintainable as a class action.

95.     The Class is so numerous that joinder of all members is impracticable. As of November 3, 2016, the Company had 113,154,501 outstanding shares. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through discovery, upon information and belief, there are thousands of members in the Class.

96.     Questions of law and fact are common to the Class, including, *inter alia*, the following:

(i)     whether the Proxy contained materially false and misleading statements or omitted material information;

(ii)    whether the Board breached its fiduciary duties by issuing the false and misleading Proxy and administering the Plan in a manner that directly contravened the representations made in the Proxy;

(iii)   whether Plaintiff and the other members of the Class have been or will be harmed by the wrongs complained of herein; and

(iv)    whether Plaintiff and the Class are entitled to injunctive relief as a result of the Board's wrongful conduct.

97.     Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature. Plaintiff's claims are typical of the claims of other members of the Class and Plaintiff has the same interests as the other members of the

Class. All EnteroMedics stockholders were forced to cast an uninformed vote as a result of the materially false and misleading Proxy. Accordingly, Plaintiff is an adequate representative of the Class and will fairly and adequately protect the interests of the Class.

98.     The prosecution of separate actions by individuals members of the Class would create the risk of inconsistent or varying adjudications with respect to individual members of the Class that would establish incompatible standards of conduct for Defendants, or adjudications with respect to individual members of the Class that would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair their ability to protect their interests.

99.     Defendants have acted, and refused to act, on grounds that apply generally to the Class, and are causing injury to the Class, such that final injunctive or declaratory relief is appropriate on behalf of the Class as a whole.

100.     The questions of law and fact common to the members of the Class predominate over any questions affecting only its individual members, such that a class action is superior to any other available method for fairly and efficiently adjudicating the controversy.

**COUNT I**
**Breach of Fiduciary Duty**
**(Derivative claim against the Board Defendants)**

101.     Plaintiff repeats the allegations of paragraphs 1-92 as if set forth in full herein.

102.     The Board Defendants owe stockholders a fiduciary duty, which includes a duty to speak truthfully when seeking stockholder action.

103.     The Proxy contained materially false and misleading statements concerning the effect of the impending Reverse Stock Split on the Amended Plan's Plan Capacity. In particular, the Proxy represented that following the implementation of the Reverse Stock Split, the Board

would reduce the Plan Capacity by the chosen "Reverse Stock Split ratio," which representation proximately resulted in stockholders voting to approve the Amended Plan.

104.    In direct contravention of the representations made by the Board Defendants and in breach of their fiduciary duties, the Board Defendants did not appropriately reduce the Plan Capacity by the Reverse Stock Split ratio.

105.    The Board Defendants then further breached their fiduciary duties by granting themselves and other insiders stock awards under the Amended Plan that were not properly authorized by stockholders.

106.    Accordingly, Plaintiff and the Company are entitled to equitable relief, including but not limited to an order rescinding the stock awards, including the February 2017 Stock Awards, granted under the Amended Plan.

107.    Plaintiff and the Company have no adequate remedy at law.

**COUNT II**
**Unjust Enrichment**
**(Derivative claim against the Officer Defendants)**

108.    Plaintiff repeats the allegations of paragraphs 1-92 and 101-107 as if set forth fully herein.

109.    The Officer Defendants received unauthorized personal financial benefits as a result of the stock awards they received under the Amended Plan following implementation of the Reverse Stock Split.

110.    It would be unconscionable and against fundamental principles of justice, equity, and good conscience for the Officer Defendants to retain the benefits of awards, including the February 2017 Stock Options, they received as a proximate result of the Board's breach of its fiduciary duties.

111.    The Officer Defendants have been unjustly enriched at the expense and to the detriment of the Company.

112.    Accordingly, this Court should order the Officer Defendants to disgorge the stock awards, including the February 2017 Stock Options, granted to them under the Amended Plan.

113.    Plaintiff and the Company have no adequate remedy at law.

**COUNT III**
**Breach of Fiduciary Duties**
**(Class claim brought directly against the Board Defendants)**

114.    Plaintiff repeats the allegations of paragraphs 1-87 and 93-100 as if set forth in full herein.

115.    The Board Defendants breached their fiduciary duty by causing the Company to issue the materially false and misleading Proxy.

116.    As a result, the vote of the stockholders to approve the Amended Plan was not fully informed and is invalid. The Amended Plan, therefore, should be rescinded.

117.    As a result, Plaintiff and the Class members are being, and will continue to be, harmed.

118.    Plaintiff and the Class have no adequate remedy at law.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

A.    Declaring this action to be a class action and certifying Plaintiff as the Class representative and his counsel as Class counsel;

B.    A declaration that the Proxy was materially false and misleading;

C.    Rescinding the Amended Plan approved at the Special Meeting;

D.      An order declaring any awards made under the Amended Plan following its purported approval, including the February 2017 Stock Options, to be invalid and subject to disgorgement;

E.      Awarding Plaintiff the costs and disbursements of this action, including reasonable allowance of fees and costs for Plaintiff's attorneys, experts, and accountants; and

F.      Granting Plaintiff such other and further relief as the Court may deem just and proper.

Dated: February 24, 2017                           Respectfully submitted,

                                                   **FARNAN LLP**

                                                   */s/ Michael J. Farnan*_____
                                                   Brian E. Farnan (Bar No. 4089)
                                                   Michael J. Farnan (Bar No. 5165)
Of Counsel:                                        919 North Market Street, 12th Floor
                                                   Wilmington, DE 19801
Steven J. Purcell                                  302-777-0300 Telephone
Douglas E. Julie                                   302-777-0301 Facsimile
Robert H. Lefkowitz                                bfarnan@farnanlaw.com
PURCELL JULIE & LEFKOWITZ LLP                      mfarnan@farnanlaw.com
65 Broadway, Suite 828
New York, New York 10006                           *Attorneys for Plaintiff*
212-725-1000